IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

DERRICK GORDON VANCE,

     Plaintiff,

v.                              CASE NO. 2:11-cv-0781

MICHAEL J. ASTRUE,
Commissioner of Social Security,

     Defendant.

## M E M O R A N D U M   O P I N I O N

     This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  Both parties have consented in writing to a decision by the United States Magistrate Judge.

     Plaintiff, Derrick Gordon Vance (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on August 13, 2009, alleging disability as of July 1, 2009, due to a heart attack, back injury, right leg/knee problems, spurs in the neck, right shoulder problems, anxiety, and depression.[1]  (Tr. at 11, 112-17, 118-21, 132-41, 191-97, 215-21.)  The claims were denied initially and upon reconsideration.  (Tr. at 11, 62-67, 71-73, 74-76.)  On March 26, 2010, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 77.)  The hearing was held on January 6, 2011 before the Honorable Andrew J.

---

[1] Claimant previously filed a claim for concurrent Title II and Title XVI disability benefits on April 1, 1993.  This claim was appealed through administrative hearing level and denied by ALJ decision dated June 23, 1994.  This Decision was upheld on Appeals Council review in August 1994. (Tr. at 11.)

Chwalibog.  (Tr. at 30-57, 85, 91, 106, 108.)  By decision dated April 1, 2011, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 11-22.)  The ALJ's decision became the final decision of the Commissioner on August 25, 2011, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-5.)  On October 20, 2011, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. §§ 404.1520, 416.920 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. §§ 404.1520(a), 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. §§ 404.1520(b), 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. §§ 404.1520(c), 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. §§ 404.1520(d), 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. §§ 404.1520(e), 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie

2

case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2002).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 13.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of chronic pain syndrome secondary to musculoskeletal strain injuries, degenerative disc disease, and internal derangement of the knee, coronary artery disease, major depressive disorder and panic disorder with history of substance abuse in remission.  (Tr. at 13-14.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 15-17.)  The ALJ then found that Claimant has a residual functional capacity for medium work, reduced by nonexertional limitations.  (Tr. at 17-20.)  As a result, Claimant cannot return to his past relevant work.  (Tr. at 20.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as hand packagers, dining room attendants, price markers, routing clerks, inspectors, and sorters which exist in significant numbers in the national economy.  (Tr. at 20-21.)  On this basis, benefits were denied.  (Tr. at 22.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.   <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).   Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 46 years old at the time of the administrative hearing.  (Tr. at 34.)  He has a high school education.  (Tr. at 35, 295.)  In the past, he worked as a truck driver, carpenter and welder.  (Tr. at 36-37, 295.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

Physical Health Evidence

On February 23, 2004, March 4, 2004, May 13, 2004, and May 20, 2004, Scott Coffey, D.O., evaluated Claimant for complaints of left arm pain, neck pain, anxiety, and palpitations. (Tr. at 235-42.) Although the handwritten notes are largely illegible, the final progress note states: "Follow up - pt [patient] feeling better now. Lexapro causing diarrhea, aggravation, and nervousness, cont [continues to] worry constantly." (Tr. at 239.) Dr. Coffey ordered x-rays of Claimant's cervical spine on the first visit, which showed: "There are changes of degenerative disc disease, most significant at C6-7. MRI can be obtained as clinically indicated." (Tr. at 240.) An MRI dated March 2, 2004, showed: "Moderate degenerative disc disease at C6-7 as seen on plain film with posterior spurring and resultant mild to moderate foraminal narrowing bilaterally." (Tr. at 241.)

From January 6, 2008 to August 18, 2009, Claimant had twenty-nine office visits at Chapmanville Medical Center for "CLBP [chronic low back pain], cervical pain, depression, anxiety." (Tr. at 273-83.) The notes show that at every monthly visit Claimant was provided refills of "Lortab 5.0 mg...#60 [or 7.5 mg #45], Xanax 0.5 mg...#30." Id.

On March 12, 2008, Charles N. Vance, M.D. provided a Medical Examination Report for Commercial Driver Fitness Determination. (Tr. at 243-45.) Dr. Vance found Claimant passed the physical examination, was 6' 0" tall, 168 pounds, and "meets standards in 49 CFR 391.41; qualifies for 2 year certificate." (Tr. at 245.) In the "Health History" section completed by Claimant, he marked only "Yes" to "Nervous or psychiatric disorders, e.g. severe depression" and stated that he was prescribed the medications "Paxel, Cariline." (Tr. at 243.)

On July 14, 2009, Claimant was admitted to Saint Francis Hospital as a direct

5

admission from Logan Regional Medical Center due to "[a]cute coronary syndrome." (Tr. at 246, 251-52, 258-72.) He had the following procedures: "1. Left heart catheterization. 2. Selective coronary angiography. 3. Left ventriculogram. 4. Right common femoral angiogram with Angio-Seal deployment" and was discharged on July 15, 2009. (Tr. at 246-48, 339-41.) Mitchell Nicholas Rashid, M.D., cardiologist, West Virginia Heart and Vascular Institute, noted that Claimant's echocardiogram was "[e]ssentially normal" and concluded:

> IMPRESSION:
> 1.  Mild nonobstructive coronary artery disease...
> 2.  Moderate mid-left anterior descending coronary artery myocardial bridging.
> 3.  Normal left ventricular function.
>
> PLAN: Medical management and risk factor modification.  Will change Lepressor to Cardizem for better vasodilation for variant angina and for treatment of his myocardial bridging.  Recommend absolute smoking cessation.  The patient will follow up with me in six to eight weeks' time.  If the patient continues to have chest pain will determine ischemic burden in that mid-right coronary artery lesion with a Cardiolite exercise stress test.

(Tr. at 247, 248.)

On September 30, 2009, Peter Chirico, M.D. provided a Lumbar spine 3-view x-ray interpretation for the Disability Determination.  (Tr. at 284-87.)  Dr. Chirico concluded: "Minimal osteophyte formation is noted primarily at the L3-L4 level.  Minimal disc space narrowing noted at L3-L4.  No fracture or subluxation or significant disc space narrowing is seen.  IMPRESSION: MINIMAL ARTHRITIC CHANGES.  NO FRACTURE OR SUBLUXATION." (Tr. at 284, 286.)

On October 16, 2009, Dr. Rashid saw Claimant for a follow-up visit.  He stated: "Overall the patient is doing well.  The patient has a history of stable one vessel disease...He has been experiencing chest discomfort...He continues to use tobacco despite

recommendations to stop entirely." (Tr. at 343.)

On October 20, 2009, a State agency medical source provided a Disability Determination Examination. (Tr. at 288-92.) The evaluator, Alfredo C. Velasquez, M.D. determined that Claimant had "chronic cervical and lumbosacral muscle pain" and diagnosed "[l]umbosacral muscle strain, cervical muscle strain, increased angina pectoris." (Tr. at 290.)

On November 2, 2009, a State agency medical source completed a Physical Residual Functional Capacity Assessment [PRFCA]. (Tr. at 299-306.) The evaluator, Rogelio Lim, M.D., stated that Claimant's primary diagnosis was "HX [history] of MI [myocardial infarction] per patient", his secondary diagnosis was "back pain", and his other alleged impairments were "knee pain, anxiety, alcoholism." (Tr. at 299.) Dr. Lim concluded that Claimant could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, sit, stand and/or walk (with normal breaks) for a total of about six hours in an 8-hour workday, and had unlimited ability to push and/or pull (including operation of hand and/or foot controls). (Tr. at 300.) Dr. Lim found that Claimant had no postural limitations, save for climbing ladder/rope/scaffolds, which he could do occasionally. (Tr. at 301.) He concluded that Claimant had no manipulative, visual or communicative limitations. (Tr. at 302-03.) Claimant had no environmental limitations save to avoid concentrated exposure to extreme temperatures, vibration, and fumes, odors, dusts, gases, poor ventilation, etc. (Tr. at 303.) Dr. Lim concluded: "Multiple allegations somewhat exaggerated. No evidence of heart attack. Allegations not credible. Knee pain but full ROM [range of motion]. Low back pain but full ROM and no objective findings of radiculopathy." (Tr. at 306.)

On November 17, 2009, Claimant became a patient at Lincoln Primary Care Center [LPCC] in order to establish care: "On disability for his back and right leg...States he may have had an MI in the past...smokes 1-2 PPD [packs per day] X [times] 30 years, occasional EtOH usage, says takes Xanax and Lortab from other people 'as much as possible for pain', on disability because of back and neck." (Tr. at 330-31.) The evaluator, Victor Lahnovych, M.D. concluded:

> ASSESSMENT: 1) Lumbosacral radiculopathy [P]; 2) CAD [coronary artery disease]; 3) Unspecified Episodic Mood Disorder...
>
> This former patient of Dr. McDevitt has been taking Xanax and Lortab from his girlfriend.  Will need to explore potential of addiction first before any controlled substances can be prescribed by LPCC...Mary Crouch to evaluate potential for addictions and for Prestera intake, given his history of anxiety, substance abuse, and past psychiatric hospitalizations.

(Tr. at 330-32.)

On December 15, 2009, Dr. Lahnovych, LPCC, stated that Claimant had "been evaluated by Mary Crouch...The patient's UDS [urine drug screen] was appropriate...PLAN: Hydrocodone 7.5/Acetaminophen 500 mg take one (10 tablet by mouth three times a day as needed.  Quantity: 90; Refills 0." (Tr. at 336-37, 461-62.)

On December 18, 2009, Dr. Rashid that Claimant's Myocardial Perfusion Scan, wall motion, and LV [left ventricular] function were normal.  (Tr. at 346.)  His assessment stated: "Cardiovascular Disease 429.2; Hyperlipidemia, Mixed 272.2." Id.

On December 23, 2009, Ahmet "Ozzie" Ozturk, M.D., Pain Care Center, Clinical Professor, Marshall University School of Medicine, stated the results of his evaluation of Claimant:

> Nerve conduction study performed for evaluation of lower extremity symptoms with particular focus on leg pain.

Study Results:

Lower extremity motor findings: The peroneal DML was bilaterally normal. The tibial DML was bilaterally normal.  The tibial CMAP amplitude was bilaterally normal.  The peroneal F-wave was normal, but an A-wave was detected, on the left and normal on the right.  The tibial F-wave was bilaterally normal.

Lower extremity sensory findings: The sural DSL (recorded from proximal electrode pair) was abnormal on the left and normal on the right.  The sural SNAP amplitude (recorded from proximal electrode pair) was bilaterally normal...

Computer Analysis:

Lower extremity: Data does not rule-out a mild left L5/S1 radiculopathy. Right peroneal and tibial nerve measurements, including proximal response, are within normal limits.  The likelihood of a right L5/S1 radiculopathy or proximal neuropathy is low.

Polyneuropathy: An early stage polyneuropathy can not be excluded...

Radiculopathy Note: Peroneal nerve response from the EDB muscle represent predominately L5 root innervation, however the EDB muscle may also have some S1 root innervation.  Tibial nerve responses from the AH muscle represent predominantly S1 root innervation, however, the AH muscle may also have some L5 and S2 root innervation...Because of the potential for overlapping myotomal patterns, specific root involvement should be clinically corroborated.

(Tr. at 484-86.)

On February 25, 2010, a State agency medical source completed a Physical Residual Functional Capacity Assessment.  (Tr. at 388-95.)  The evaluator, Porfirio Pascasio, M.D. stated that Claimant's primary diagnosis was "non-obstructive CAD [coronary artery disease]" and his secondary diagnosis was "back & [and] neck pain syndrome."  (Tr. at 388.) Dr. Pascasio concluded that Claimant could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, sit, stand and/or walk (with normal breaks) for a total of about six hours in an 8-hour workday, and had unlimited ability to push and/or pull (including operation of hand and/or foot controls).  (Tr. at 389.)  Dr. Pascasio found that Claimant had no postural limitations, save for climbing ladder/rope/scaffolds, which he

9

could do occasionally.  (Tr. at 390.)  He concluded that Claimant had no manipulative, visual or communicative limitations.  (Tr. at 391-92.)  Claimant had no environmental limitations save to avoid concentrated exposure to extreme temperatures, vibration, and fumes, odors, dusts, gases, poor ventilation, etc.  (Tr. at 392.)  Dr. Pascasio concluded: "I agree with prior evaluation that cmt. [claimant] is partially credible."  (Tr. at 393.)

On March 15, 2010, Dr. Lahnovych noted that Claimant had a follow-up examination and was "in no acute distress."  (Tr. at 458-59.)

On March 27, 2010, Claimant was admitted to Logan Regional Medical Center Emergency Department for treatment of a "re-injury to R [right] knee 3 days ago while walking down steps, noted marble-sized 'knot' on R Lat [lateral] knee cap."  (Tr. at 397.) Claimant was advised to "ice, elevate, use crutches" and to follow-up with Dr. McCleary. (Tr. at 403.)  Ricky Compton, M.D., radiologist, stated that a right knee x-ray showed: "This is normal body alignment.  Joint spaces are maintained.  No fracture or joint effusion. IMPRESSION: Negative study."  (Tr. at 404.)

On March 31, 2010, Robert McCleary, M.D., Logan Regional Medical Center, noted

obvious deformity of the right knee with pain and swelling over the lateral aspect of the lateral femoral condyle.  It is a hypermobile place.  It feels like a loose body versus a cyst in the knee.  He has full knee range of motion.  He has positive crepitation.  He has a mild ballotable patella suprapatella pouch effusion.  He has 4/5 muscle strength...

IMPRESSION: Right knee derangement with loose body.

PLAN:  I injected the knee with 6 mg of Decadron, 2 ml of 2% Lidocaine.  If he continues to have persistent pain, I recommend arthroscopy.

(Tr. at 405-06, 427-28.)

On April 12, 2010, Dr. Lahnovych noted that Claimant had a follow-up examination

and was "in no acute distress." (Tr. at 457-58.)

On April 12, 2010, M. Jason Akers, M.D., Radiology, Inc., reviewed cervical and lumbar spine x-rays per the request of Dr. Lahnovych. Dr. Akers stated: "IMPRESSION: Multilevel degenerative disc disease with narrowing of the C7 foramina suggested. Lumbar spine: Vertebral body heights and alignment are normal. There is mild degenerative disc space narrowing at L3-4, L4-5, and L5-S1. There is facet arthrosis at L5-S1." (Tr. at 432.)

Records indicate Claimant had physical therapy at Barboursville Physical therapy on April 28, 2010, May 3, 2010, May 7, 2010, and May 17, 2010 upon referral from Dr. Lahnovych for Claimant's complaints of neck, back and right lower extremity pain. (Tr. at 416-19, 449-50.) Claimant also did not show for four appointments scheduled for May 10, 2010, May 13, 2010, May 21, 2010, and May 26, 2010. (Tr. at 417.) Greg S. Bowling, Physical Therapist [PT], noted:

> Mr. Vance reports he has been having chronic low back problems and (R) lower extremity problems for at least 10 years. He developed drop foot 10 years ago secondary to a pinched nerve. The last 3 years he has been having increased pain; however over the past year it has gotten significantly worse. He is not working at this time; however he was driving an off road dump truck last year and his back/leg/neck pain became so severe he had to stop working. He reports he has applied for disability...

(Tr. at 418-19.)

On May 18, 2010, Dr. Lahnovych saw Claimant for a follow-up visit. He stated: "Split up with his wife. Back pain prevented him to go to physical therapy, but states he is willing to go...Assessment: 1) Hypertension - Unspecified Essential [P]; 2) Right knee pain - eval [evaluation] by Dr. McCleary at Logan." (Tr. at 434-35, 455-56.) Claimant was given instructions on managing hypertension. (Tr. at 436.)

On July 16, 2010, Rehan Memon, M.D., a specialist in pain management, Clinical

Assistant Professor, Department of Neuroscience, Marshall University JCE School of Medicine, evaluated Claimant upon request by Dr. Lahnovych.   (Tr. at 440-45.) He diagnosed Claimant with "Chronic Pain Syndrome" and stated: "I am not sure about the pain generator in this gentleman.  We will try to get EMG/NCS as well as MRI done before rescheduling him for any further treatments."  (Tr. at 444.)

On August 10, 2010, Dr. Lahnovych saw Claimant for a follow-up visit.  He stated that Claimant alleged that "Lortab was stolen day before yesterday…Has right knee surgery by Dr. McCleary on 8/19/10, so he is apprehensive..The patient is concerned about colon cancer in himself…set up for screening colonoscopy."  (Tr. at 437-38.)

On September 8, 2010, Jon Bowen, Guyan Valley School Health Center, stated: "Chief Complaint: Establish care – neck, back, R knee pain/anxiety/stress test scheduled. Patient presents for chronic disease management of hypertension…hyperlipidemia… anxiety/panic disorder…chronic pain…back pain…osteoarthritis …Today's Orders: Alprazolam Tab 0.5 mg…Will start Xanax…Will increase Lortab to qid and will fill early when runs out."  (Tr. at 452, 470.)

On September 13, 2010, Dr. Rashid evaluated Claimant to provide clearance for Claimant to undergo a colonoscopy and knee surgery.  (Tr. at 489-503.)  He concluded: "IMPRESSION: 1) Negative treadmill stress test; 2) Normal hemodynamic response to exercise; 3) Good functional capacity; 4) No symptoms; 5) No arrythmia; 6) Cardiolite to follow."  (Tr. at 491.)

On October 20, 2010, Roger A. Blake, M.D., radiologist, Cabell Huntington Hospital, reported the results of an MRI Spine Lumbar without contrast:

IMPRESSION: Degenerative changes are noted diffusely in the mid to lower

> lumbar spine.  There is a right lateral disc protrusion involving the outer right
> L4/5 facet and the exit from it but clear cut impingement on the right L4 root
> is not identified.  No significant spinal canal stenosis is noted.

(Tr. at 464-65.)

On October 25, 2010, Waseem M. Shora, M.D., Cabell Huntington Hospital, provided Dr. Lahnovych with the results of Claimant's colonoscopy: "Normal ileocceal valve, cecum, ascending colon, traverse colon, descending colon, sigmoid colon, rectosigmoid junction, and rectum.  Grade 1 hemorrhoids found in the anus (455.6).  Mild diverticulosis (562.10) found in the sigmoid colon."  (Tr. at 474-77.)

On November 8, 2010,  Jon Bowen, Guyan Valley School Health Center, stated: "Chief Complaint: Follow-up.  Patient presents for chronic disease management of hypertension...hyperlipidemia...   anxiety/panic   disorder...chronic   pain...back pain...osteoarthritis ...Today's Orders: Renew Alprazolam...renew Xanax." (Tr. at 478-80.)

Mental Health Evidence

On October 21, 2009, a State agency medical source completed a Psychological Evaluation Report.  (Tr. at 293-98.)  The evaluator, Kelly Robinson, M.A. concluded:

> Mr. Vance smokes one pack of cigarettes per day and has been smoking for
> more than 20 years.  He drinks 5 cans of soda and 10 cups of coffee per day.
> He reports a loss of 30 pounds in the past six months and a loss of appetite.
> Sleep is characterized by difficulty falling asleep and frequent awakening.  He
> sleeps four to six hours a night...
>
> **SUBSTANCE ABUSE HISTORY**
> Mr. Vance reports he does not drink but reports a history of regular alcohol
> use for 30 years until quitting about three months ago.  He reports
> withdrawal symptoms in the form of sweats and tremors.  His tolerance
> increased over the years.  He reports numerous unsuccessful efforts to quit
> drinking.  His last reported usage was three months ago.  He denies any
> current related problems.  His longest length of sobriety has been seven
> months.  He reports a history of one inpatient hospitalization in 1991 for
> alcohol abuse in Tampa, Florida.  He has also had outpatient treatment

throughout the years.  He reports a history of six arrests for DUI.  His last arrest was in 2004.  He reports he does not use drugs but reports a history of drug use involving "about whatever I could get...cocaine, marijuana, acid, Tee" for 20 years  until quitting around 2000.  He experienced withdrawal symptoms in the form of nausea and vomiting.  His tolerance increased over time.  His last reported usage was nine to 10 years ago.  He reports a history of one hospitalization for substance abuse in 1991 in Florida.  He has also received outpatient treatment throughout the years.  He denies any legal related problems...

He has been fired several times due to alcohol related problems...

Mr. Vance is separated.  He has been married three times.  He was married for the first time in his early 20's and he divorced less than one year later due to "we just didn't get along after she lost both children, miscarried."  He was married a second time for two to three years.  No children resulted.  He was married the third time in 1997 and he has been separated since 2001 due to "abusive relationship."  No children have resulted.  He has a girlfriend he has been dating for about five years.

**LEGAL HISTORY**
Mr. Vance reports a history of six arrests for DUI and one arrest for aggravated burglary.  His last arrest was in 2004.

**MENTAL STATUS EXAMINATION**:
**Orientation** - He was alert throughout the evaluation.  He was oriented to person, place, time and date.
**Mood** - Observed mood was dysphoric.
**Affect** - Affect was mildly restricted.
**Thought Processes** - Thought processes appeared logical and coherent.
**Perceptual** - He reports no unusual perceptual experiences.
**Insight** - Insight was fair.
**Judgment** - Within normal limits based on his response to the finding the letter question.  He stated "put it in the mailbox."
**Suicidal/Homicidal Ideation** - He reports a history of one suicide attempt around 2001 in which "I put a gun to my head."  He denies current suicidal ideation.  He denies homicidal ideation.
**Immediate Memory** - Immediate memory was within normal limits.  He immediately recalled 4 of 4 items.
**Recent Memory** - Recent memory was moderately deficient.  He recalled 2 of 4 items after 30 minutes.
**Remote Memory** - Remote memory was mildly deficient based on ability to provide background information.
**Concentration** - Concentration was within normal limits based on his score of nine on the Digit Span subtest of the Wais-III.

**Psychomotor Behavior** - Normal.

**DIAGNOSTIC IMPRESSION**

| AXIS I: | 296.33 | Major Depressive Disorder, Recurrent, Severe without Psychotic Features |
| | 300.01 | Panic Disorder with Agoraphobia |
| | 303.90 | Alcohol Dependence, Early Full Remission |
| | 304.80 | Polysubstance Dependence, In Remission |
| AXIS II: | 799.9  Diagnosis Deferred | |
| AXIS III: | By self-report: heart problems, high cholesterol, headaches, stomach problems and back, neck and right shoulder, leg and knee problems. | |

**RATIONALE**

Mr. Vance was given the diagnosis of Major Depressive Disorder, Recurrent, Severe without Psychotic Features based on the following criteria: diminished interest in activities, difficulty concentrating, loss of weight and appetite, feelings of worthlessness and hopelessness, sleep difficulty, feeling of sadness, irritability, crying spells and fatigue.  He reports depressed mood for seven days per week.  He reports a decline from his previous level of functioning.  He was given the diagnosis of Panic Disorder without Agoraphobia based on the following criteria: reports unexpected fearful episodes characterized by breathing difficulty, heart palpitations, chest pain, feelings of confusion, feelings of nervousness, cold sweats, shakiness and numbness in his body.  He reports an episode will peak within 10 minutes.  There is no evidence of agoraphobia.  He was given the diagnosis of Alcohol Dependence, Early Full Remission based on the following criteria: a maladaptive pattern of alcohol use leading to clinically significant impairment as manifested by withdrawal, tolerance and numerous unsuccessful efforts to quit drinking.  He was given the diagnosis of Polysubstance Dependence, In Remission based on the following criteria: the person was using at least three groups of substances with no single substance predominating.  His AXIS II diagnosis was deferred due to educational history with no available test results.

**DAILY ACTIVITIES**

Typical Day: Mr. Vance goes to bed at 7:00 am and gets up at 11:00 am.  He describes his typical day as "nothing, I don't do anything, don't feel like doing anything, I might get up and go out, watch tv, if my girlfriend needs some help or something, I might help her or something like that."

**Activities**:

**Daily** -        takes his medications, reads the mail, watches tv, visits with his girlfriend and goes to bed.  He could identify no other daily activities as he states "I don't feel like doing anything."

15

**Weekly** - mows the grass with a riding mower which takes about 45 minutes. He states "my back and neck, I can't just sit on it, sometimes I have to get up and walk around."

**Monthly** - could report no monthly activities. He states "I don't have any money."

**Hobbies/Interests**:  None.

**SOCIAL FUNCTIONING**
During the evaluation, social functioning was within normal limits based on his interaction with the examiner and the staff.

**CONCENTRATION**
Attention/concentration were within normal limits based on his score of nine on the Digit Span subtest of the WAIS-III.

**PERSISTENCE**
Persistence was mildly deficient based on the MSE.

**PACE**
Pace was within normal limits based on the MSE.

**CAPABILITY TO MANAGE BENEFITS**
Mr. Vance appears incapable to manage any benefits he might receive due to alcohol dependence.

**PROGNOSIS**:  Fair.

(Tr. at 294-98.)

On November 9, 2009, a State agency medical source completed a Psychiatric Review Technique form. (Tr. at 307-20.) The evaluator, Aroon Suansilppongse, M.D. concluded that Claimant's affective disorder and substance addiction disorder impairments were "not severe" and that there were "cooexisting nonmental impairment(s) that requires referral to another medical specialty." (Tr. at 307.) Dr. Suansilppongse found that Claimant had a mild degree of limitation regarding restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation, each of extended duration. (Tr. at

16

317.)  He found that the evidence does not establish the presence of the "C" criteria.  (Tr. at 318.)   Dr. Suansilppongse  concluded: "Claimant's allegations are considered partially credible."  (Tr. at 319.)

On December 9, 2009, Charles Hoover, Clinician, Prestera Center, provided an Initial Psychiatric Evaluation of Claimant because he had "applied for disability…[due to complaints of] nerves, depression, anxiety." (Tr. at 322.) Mr. Hoover stated: "Client needs to reduce overall levels of depression and anxiety in order to improve level of daily functioning." (Tr. at 324.) Mr. Hoover wrote that Claimant stated: "'May be 10 years ago was when I started getting treatment, but I had a rough childhood and stuff and I think it started then.  All I ever wanted out of life was to be happy and I never have been.'" (Tr. at 326.) Claimant reported that he had been in a Florida psychiatric hospital in 1994 for alcohol, drug abuse and depression.  Id.  Claimant reported that he "lives part-time with his girlfriend and her children/grandchildren and part-time with his parents…current relationship has not been violent for 4-5 years…both quit drinking…3 marriages - 2 divorces, currently separated for 9 years." (Tr. at 327-28.)

On February 18, 2010, Darshan Dave, M.D., psychiatrist, Prestera Center for Mental Health, stated in a largely illegible handwritten Psychiatric Review form that Claimant's motoric behavior was "calm", attitude "cooperative", mood 'I feel depressed'", affect "constricted", thought process "goal directed", memory "fair", concentration and calculation "fair", and intelligence "average." (Tr. at 488.)

On February 20, 2010, a State agency medical source completed a Psychiatric Review Technique form.  (Tr. at 370-83.) The evaluator, Holly Cloonan, Ph.D., concluded that a Mental Residual Functional Capacity Assessment was necessary to evaluate

Claimant's affective (MDD, recurrent, severe), anxiety, and substance abuse addiction (polysubstance dependence, in remission) disorders. (Tr. at 370, 373, 375, 378.)  Dr. Cloonan concluded that Claimant had a mild degree of limitation regarding restriction of activities of daily living; a moderate degree of limitation regarding difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace; and no episodes of decompensation, each of extended duration.  (Tr. at 380.)  She concluded that the evidence did not establish the presence of the "C" criteria.  (Tr. at 381.)  Dr. Cloonan concluded:

> The claimant appears mostly credible, however his allegation of sx [symptom] severity is not fully supported by MER [medical evidence of record] in file. No problems following instructions across sources, for example.  He is credible in his report of worsening as he has only sought mental health tx [treatment] since mid-December.  Tx source reported claimant's statement he'd had alcohol w/in [within] the prior mo. [month], supporting current dx [diagnosis] of alcohol dependence.  The claimant has moderate limits in some F.C. [functional capacities] described on the MRFC [mental residual functional capacity].

(Tr. at 382.)

On February 20, 2010, Dr. Cloonan completed a Mental Residual Functional Capacity Assessment form.  (Tr. at 384-87.) She opined that Claimant was "not significantly limited" in the ability to remember locations and work-like procedures; to understand and remember very short and simple instructions; to carry out very short and simple instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to make simple work-related decisions; to complete a normal workday and workweek without interruptions

18

from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to ask simple questions or request assistance; to get along with coworkers or peer without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others.  (Tr. at 384-85.)  She marked that Claimant was "moderately limited" in the ability to understand and remember detailed instructions; to carry out detailed instructions; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately to changes in the work setting.  Id.   Dr. Cloonan concluded:

> The claimant may have the above moderate limits in F.C. [functional capacity] consistent w/ [with] his mental condition & [and] w/ hx including school records.  He is able to learn and perform uncomplicated work-like activities in a setting w/ limited interactions w/ others.  Alcohol dependence appears likely to exacerbate these limits based on legal hx & difficulty getting along w/ others.

(Tr. at 386.)

On May 4, 2010, Claimant was evaluated at Prestera Center for Mental Health Services, Lincoln County Office.  (Tr. at 413-14.)  The evaluator, Nika Razavipour, M.D., psychiatrist, provided a medication management follow-up and refilled Claimant's medications for Paxil and other drugs (illegible).  Although the handwritten notes are largely illegible, Claimant's diagnosis is listed as: "MDD recurrent, severe; anxiety dis [disorder] NOS [not otherwise specified]; alcohol dependence / polysubstance abuse." (Tr. at 414.)

19

On July 7, 2010, handwritten, largely illegible notes from Dr. Razavipour, Prestera Center, indicate: "Moved out.  Parents (due to girlfriend's kids)...Denies any drinking for a long time.  Feels somewhat better overall."  (Tr. at 429, 559.)

On August 3, 2010, Kevin M. White, M.A., licensed social worker, stated in an outpatient therapy note:

> Describe your treatment strategy:  Rational Emotive Therapy.
>
> Purpose of today's session: To continue psychotherapy (face to face at LSO] focusing on decreasing symptoms of depression and anxiety and developing more effective coping mechanisms...
>
> He appears to be making a good effort in therapy and he expresses that, "I am glad I started coming in and talking to you.  I think it helps me."
>
> Action steps, plan for follow up: Continue to see Dr. Razavipour for med mgmt [management] and/or psychiatric evaluations every one to three months.

(Tr. at 447, 558.)

On September 1, 2010, Dr. Razavipour evaluated Claimant and stated: "Pt [patient] states he feels stuck in WV (came to his parents due to lack of income and inability to work due to his problem].  Wants to stay in bed mostly.  Not motivated.  Watching TV only...awaiting Social Security.  Has an attorney."  (Tr. at 448, 555.)

On September 9, 2010, Mr. White stated in an outpatient therapy note:

> Client reports that he is taking Paxil as prescribed with a fair response...He states, "I'm not sure that I want to see Dr. Razavipour anymore but I will give it one more try.  I am still staying tore up a lot and problems never seem to go away.  Just have more of them come up.

(Tr. at 446, 554.)

Claimant's New Evidence presented to Appeals Council

The records indicate Claimant continued to receive psychiatric treatment at Prestera

Center for Mental Health Services from November 8, 2010 to July 12, 2011. (Tr. at 505-53.)

Claimant cancelled or did not show for appointments scheduled for October 12, 2010, October 27, 2010, December 13, 2010, January 12, 2011, February 22, 2011, May 5, 2011, May 23, 2011, June 7, 2011, June 16, 2011, and July 12, 2011. (Tr. at 510, 512, 513, 514, 515, 528, 539, 540, 552, 553.)

On November 8, 2010, Kevin M. White, M.A., Prestera Center, stated that Claimant continued to receive Rational Emotive Therapy and noted:

> It is realistic to expect some roadblocks in day to day life but it is unrealistic to just give up when barriers arise. Frustration is to be expected but allowing frustration to turn to disturbed emotions only leads to negative outcomes. Client displays fair insight into subject matter presented today.

(Tr. at 551.)

On November 11, 2010, Charles R. Hoover, Jr., B.A., Prestera Center, provided a medication management session to Claimant. (Tr. at 543-50.)

On November 30, 2010, Nika Razavipour, M.D., Prestera Center, noted Claimant was "calm...cooperative...'depressed'...constricted...goal directed" with "fair" memory, concentration, and calculation." (Tr. at 541.)

On February 4, 2011, Mr. White provided a mental health assessment and supportive counseling session to Claimant. (Tr. at 529-38.) He noted: "Social isolation and intense feelings of hopelessness and helplessness are negatively impacting daily functioning. ADL's OK but motivation is low...Support system fair at best. Continue to address depressive symptoms with med mgmt and psychotherapy." (Tr. at 529.) He noted Claimant had not abused alcohol or substances since December 1, 2004. (Tr. at 534.)

On March 10, 2011, Mr. White stated that Claimant continued to receive Rational

Emotive Therapy and noted: "Client displays fair insight into subject matter presented today.  His rather deep level of discouragement is a barrier to progress."  (Tr. at 527.)

On March 15, 2011, Dr. Razavipour stated that Claimant was "[a]waiting a decision on his disability", that his GAF was 60, and that he was not suicidal.  (Tr. at 525.)

On March 16, 2011, Mr. White provided a medication management session to Claimant. (Tr. at 517-24.)

On April 12, 2011, Mr. White stated that Claimant continued to receive Rational Emotive Therapy and noted: "Client displays fair insight into subject matter presented today.  Client is frustrated by current life situation, portraying a sense of hopelessness that likely interferes with his ability to internalize material.  Continue to see Dr. Razavipour for med mgmt and/or psychiatric evaluations every one to three months."  (Tr. at 516.)

On July 19, 2011, Dr. Razavipour completed a Mental Status Statement Ability to Do Work-Related Activities (Mental). Dr. Razavipour stated:

> DSM-IV Diagnosis:
> Axis I: MDD, recurrent, severe without psychotic features; Anxiety NOS;
>         Polysubstance Dependence in full remission...
> List of Prescribed Medications: Paxil, Vistaril;
> In your opinion, how severe is the mental impairment and symptoms?
> Severe;
> Prognosis opinion: Fair due to back pain mostly.

(Tr. at 506.)

Dr. Razavipour marked "[u]nable to determine at this time" regarding Claimant's ability to carry out the first section of work related activities.  (Tr. at 507.)  On 41 categories she marked "[n]one" regarding Claimant's "[s]igns and symptoms."  (Tr. at 507-08.)  She marked "[m]ild" regarding "[t]houghts of suicide", "[m]arked" regarding "[b]lunt, flat or inappropriate affect; [f]eelings of guilt and worthlessness; [g]eneralized persistent anxiety;

[s]leep disturbance", and "[e]xtreme" regarding "[p]ervasive loss of interest in almost all activities" and "[d]ecreased energy". (Tr. at 507-08.) She marked that "[o]n average" she would anticipate Claimant's impairments or treatment would cause him to be absent from work "5 or more days/month". (Tr. at 508.) She wrote that it would be difficult for Claimant to have a "regular job on a sustained basis" due to "lack of motivation, anhedonia, sad mood, worrying about lack of job, lack of income". (Tr. at 509.) She marked that Claimant was able to manage benefits in his best interest. Id.

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ failed to consider the combined effects of his physical and mental problems; (2) the ALJ failed to properly evaluate his credibility; and (3) the claim should be remanded because the Appeals Council failed to consider new and additional evidence submitted subsequent to the hearing. (Tr. at 4-8.)

The Commissioner's Response

The Commissioner asserts that the ALJ's decision is supported by substantial evidence because (1) the ALJ properly determined Claimant's impairments, alone and in combination, and Claimant did not meet or medically equal any listed impairment; (2) the ALJ properly evaluated the credibility of Claimant's subjective complaints; and (3) the Appeals Council did not err in not addressing the additional evidence submitted after the ALJ's decision because the Appeals Council is not required to articulate any reason for denying a request for review nor was the evidence "new" or "material". (Def.'s Br. at 10-20.)

Analysis

Combined Effects

Claimant first argues that the ALJ failed to consider the combined effects of his

impairments:

> It is the Plaintiff's position that the weight of the medical evidence is
> sufficient to prove that the Plaintiff is disabled...Obviously, the Plaintiff's
> physical and mental impairments in combination equal a Listed
> Impairment...In the alternative...his impairments prevent him from engaging
> in substantial activity...
> The ALJ in this matter failed to adequately and accurately consider the
> combined effects of Plaintiff's physical and mental problems, both exertional
> and nonexertional.

(Pl.'s Br. at 4-5, 8.)

The Commissioner responded that the ALJ did not err in his assessment of

Claimant's impairments:

> Plaintiff's argument that his impairments or combination of impairments
> "obviously" medically equal an impairment listed in 20 C.F.R. Pt. 404,
> subpart P, app. 1 (Listings) (Pl.'s Br. at 5) is without merit.  As an initial
> matter, Plaintiff fails to specify which listing(s) his impairments meet
> medically (Pl.'s Br. at 5).  On this basis alone, Plaintiff's argument should be
> rejected...Moreover, plaintiff makes no specific showing of specific medical
> findings that meet any of the criteria for any listing (Pl.'s Br. at 5).  Instead he
> asserts without any evidentiary proof, that his diagnoses "in combination
> equal a listed impairment" (Pl.'s Br. at 5).  This is insufficient to meet his
> burden under the listings...

> The ALJ recognized that Plaintiff had multiple musculoskeletal impairments
> and found them to be severe impairments (Tr. 13-14).  However, as the ALJ
> noted, while these impairments were "severe," they did not result in any
> significant limitations in movement or functioning as required by any listing
> in § 1.00 of the listings (Tr. 15).  Specifically, the ALJ recognized that the
> record did not establish that Plaintiff could not ambulate or perform fine or
> gross movements effectively or that he had nerve root compression, spinal
> arachnoiditis, lumbar spinal stenosis to the degree described in Listings 1.02
> and 1.04 (Tr. 15)...

> The ALJ also recognized Plaintiff's history of mental health treatment,
> finding that his depression and panic disorder with substance abuse in
> remission were severe impairments that did not rise to the severity of Listings
> 12.04, 12.06, or 12.09 (Tr. 13-17).  As the ALJ noted, Plaintiff had no more
> than moderate limitations in any area of mental functioning (Tr. 15-16)...

24

The Plaintiff listed his historical diagnoses in his brief (Pl.'s Br. at 5) is insufficient to establish that any of these conditions met or medically equaled any listing.  Because Plaintiff failed to point to any evidence supporting his claim that his impairments medically equaled a listing and, in fact, failed to even identify any relevant listing, and because substantial evidence supports the ALJ's evaluation of his impairments, the Court should reject this nonspecific and legally deficient argument and affirm the ALJ's decision.

(Def.'s Br. at 10-13.)

The ALJ made these extensive findings in regard to Claimant's impairments, "severe" and/or "non-severe", and their combined effects:

The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

While the undersigned recognizes revisions to the medical criteria related to a determination of disability of the musculoskeletal system under Section 1.00 were effective February 19, 2002 and are reflected in the analysis of the claimant's musculoskeletal impairment(s), a review of the record does not reflect the degree of motor or neurological deficits as required by any listing found under this section nor does the evidence show that he is unable to effectively ambulate or perform fine and gross movements effectively as defined by Listings 1.02A/B.  Moreover, there is no evidence of documented nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis to the degree as required by Listing 1.04.

While "severe," however, the record fails to establish that the claimant's cardiac impairment has been manifested at a degree of severity as to satisfy the full requirements of any relevant cardiovascular listing found under section 4.00 of the Appendix 1 to Subpart P of Regulations No. 4.  As required by the relevant cardiovascular listing 4.03 dealing with hypertensive cardiovascular disease, the record provides no documentation of chronic heart failure or ischemic heart disease as described under reference listings 4.02 or 4.04.  Moreover, there is no indication that the claimant's heart disease adversely impacted upon the claimant's visual efficiency (listing 2.04), renal function (listing 6.02), or caused a central nervous system vascular accident (listing 11.04 A/B).

The claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of mental disorders listings 12.04,

12.06, and by reference 12.09.  In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied.  To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  A marked limitation means more than moderate but less than extreme.   Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

In 'activities of daily living,' the claimant has no more than "mild-to-moderate" restriction...

In 'social functioning,' the claimant has no more than "moderate" difficulties...

With regard to 'concentration, persistence or pace,' the claimant has no more than "moderate" difficulties...

As for 'episodes of decompensation,' the claimant has experienced  no episodes of decompensation, which have been of extended duration...

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.  The undersigned has also considered whether the "paragraph C" criteria are satisfied.  In this regard, the evidence does not document that the claimant's mental impairment has resulted in repeated episodes of decompensation, each of extended duration; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or current history of one or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement.

The limitations identified in "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listings of Impairments (SSR 96-8p).  Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has

found in the "paragraph B" mental function analysis.

Further, after reviewing all of the evidence, including the medical records, and considering the interactive and cumulative effects of all medically determinable impairments, including any impairments that are "severe" and/or "non-severe," the undersigned finds that the claimant does not have a combination of impairments that meet or medically equal any listed impairment in Appendix 1 to Subpart P of Regulations No. 4.

(Tr. at 15-17.)

The Social Security regulations provide,

In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. §§ 404.1523, 416.923 (2011).  Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity."  Oppenheim v. Finch, 495 F.2d 396, 398 (4th Cir. 1974).  The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity.  Id.  The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed.  DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

"The Listing of Impairments describes, for each of the major body systems, impairments that are considered severe enough to prevent an adult from doing any gainful activity," see 20 C.F.R. §§ 404.1525(a) and 416.925(a) (2011), regardless of age, education or work experience, see Sullivan v. Zebley, 493 U.S. 521, 532 (1990).  "For a claimant to

27

qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to all the criteria for the one most similar listed impairment." See id. at 531.

The diagnosis of a physical impairment does not compel a finding of disability. The impairment must prevent a claimant from performing any substantial gainful activity in the national economy. 20 C.F.R. §§ 404.1505(a), 416.905(a). Claimant bears the burden of proving disability, and has not met that burden. 20 C.F.R. §§ 404.1512, 416.912. Claimant simply lists his impairments but offers no argument regarding the "combined effects" and how they prevent him from any type of employment. (Pl.'s Br. at 4-5, 8.) The ALJ considered all of Claimant's limitations in his residual functional capacity assessment and in his hypothetical question to the vocational expert, wherein he specifically asked the VE to consider an individual who had

> claimant's past education, work experience. We're going to start off by limiting the individual to medium exertional work, only occasionally climb a ladder, scaffold, frequently climb a ramp or stairs, balance, stoop, kneel, crouch and crawl with the need to avoid concentrated exposure to temperature extremes, vibration, smoke, fumes, odors, dust and pulmonary irritants.

(Tr. at 54-55.)

The VE was able to identify a number of jobs in the regional and national economy that Claimant could perform, even in the light and sedentary levels. (Tr. at 54-55.)

In a second hypothetical to the VE, the ALJ inquired:

> Now if we were to add the individual would be moderately limited in the ability to understand, remember and carry out detailed job instructions, moderately limited in the ability to interact appropriately with the general public, to accept instructions, respond appropriately to criticism from supervisors and to respond appropriately to changes in the work setting but retain the ability to learn for uncomplicated activities in a setting with limited

28

interaction with other.  With those limitations how would that effect jobs?

(Tr. at 55.)

The VE responded: "The examples I gave would be valid examples with that additional, those additional limitations."  (Tr. at 55.)

The undersigned finds that the ALJ's RFC finding accounts for all of Claimant's functional limitations that were established in the record and that substantial evidence supports the ALJ's evaluation of Claimant's impairments.

Credibility Determination

Claimant next argues that the ALJ erred in his credibility determination:

[I]t is the Plaintiff's assertion that his testimony is entitled to full credibility...Obviously, the ALJ erred when he found that the Plaintiff is only partially credible (TR. 14). It is the Plaintiff's position that because his allegations and the medical evidence of record are mutually supportive then the exacting requirements of the Social Security Disability Reform Act of 1984 are met.  This "mutually supportive test" was recognized in Coffman v. Bowen, 829 F.2d. 514 (4th Cir. 1987), and should be applied in the instant case to allow the Plaintiff the ability to satisfy the rigors of 42 U.S.C. § 423(d)(5)(A).

(Pl.'s Br. at 4-6.)

The Commissioner responds that the ALJ did not err in his consideration of Claimant's credibility:

There is no merit to Plaintiff's argument that the ALJ failed to properly consider the credibility of Plaintiff's subjective complaints (Pl.'s Br. at 5-7). To the contrary, the ALJ specifically considered the credibility of Plaintiff's subjective complaints in accordance with the regulations and found that the medical evidence did not fully support the frequency or symptom severity of his impairments (Tr. 17-20).  A claimant's allegations alone never establish that he is disabled. See 20 C.F.R. §§ 404.1529, 416.929. While the ALJ must seriously consider a claimant's subjective complaints, it is within the ALJ's discretion to weigh such complaints against the evidence and, if appropriate, to reject them.   See 20 C.F.R. §§ 404.1529, 416.929. Craig v. Chater, 76 F.3d 585, 595 (4th Cir. 1996).

Despite the generally benign objective medical findings, the ALJ in this case generously accounted for Plaintiff's pain by limiting him to a reduced range of uncomplicated medium work that limited his interaction with others (Tr. 17).  The medical evidence supports this assessment...

Plaintiff has failed to carry his burden to prove that he had functional limitations limiting his ability to work beyond those included in the RFC assessment by the ALJ.  20 C.F.R. §§ 404.1512, .1520, .1521; 416.912, .920(a), .921.  Plaintiff does not specify which, if any, additional clearly-established functional limitations the ALJ should have included in the RFC assessment, which generously accounted for Plaintiff's limitations...No further limitations beyond those the ALJ included in the RFC assessment are supported by the record.  The vocational expert testified that, if Plaintiff were fully credible, there would be no jobs that he could perform is irrelevant because the ALJ did not find that Plaintiff was fully credible, and the vocational expert listed jobs than an individual with Plaintiff's limitations could perform (Tr. 54-55).  Ultimately, the ALJ carefully considered all of the evidence before reasonably concluding that Plaintiff's allegations of pain and disabling limitations were not totally credible.  Substantial evidence supports the ALJ's credibility finding.

Plaintiff's arguments are essentially an invitation for this Court to re-weigh the evidence of record and substitute its judgment for that of the ALJ.  This is incompatible with this Court's role on judicial review.

(Def.'s Br. at 13-16.)

Regarding credibility, the ALJ made these extensive findings in his 12-page decision:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.  In short, the available evidence of record fails to support the degree of symptom severity and/or functional limitation described by the claimant and to date, no additional evidence has been submitted that would credibly support his claims of totally debilitating impairment.  As indicted, the claimant has sought treatment for his chronic pain complaints and there is sufficient objective support for associated work-related limitations.  However, he has overall had little treatment for his chronic pain condition and diagnostic and objective findings are not supportive of disabling condition.  Repeat imaging studies of both the cervical and lumbosacral spine have shown no more than mild to moderate disc

30

disease at best and interestingly, despite his chronic pain complaints, March 2008 examination by Dr. Charles Vance revealed that he met the physical standards/qualifications for a 2-year certification for a commercial driver's license (Exhibit B2F). Review of relevant treatment notes from Chapmanville Medical Center for treatment between 2008-2009 reflects no documented findings, observations, or opinions supportive of disabling impairment (Exhibit B5F), and consultative examination conducted by Dr. Alfred Velasquez in October 2009 revealed no other significant findings aside from slight tenderness of the cervical and lumbar spine (Exhibit B7F).

Otherwise, Dr. Velasquez observed no significant compromise in range of motion or neurologic deficit. The claimant was observed to have full strength in all extremities and Dr. Velasquez did not render any opinion with regard to the claimant's work-related abilities. More recent July 2010 pain management consultation was similarly insignificant for deficit and there is no indication that the claimant has been scheduled for further follow-up at this facility. This examination revealed that the claimant was able to stand and walk unassisted, with no evidence of gait antalgia, and that there was no evidence of paraspinous muscle spasm; shoulder depression or pelvic tilt; trigger point tenderness; painful joints; leg length discrepancy; joint swelling; edema; eccymosis, cyanosis, scarring, or varicosities; restriction of movement; sensory loss, reflex abnormality, peripheral vascular insufficiency, or signs/symptoms of radiculopathy. Upon initial presentation to Guyan Valley Health Care one month earlier in September 2010, attending physicians observed no findings of significance aside from segmental pain in the lumbar spine, noting intact strength, sensation, gait, and reflexes (Exhibit B38F), and lumbar spine magnetic resonance imagining (MRI) in October 2010 revealed no definitive evidence of nerve root impingement or significant spinal canal stenosis (Exhibit B39F). Further, electrodiagnostically, evidence of a left L5-S1 is characterized as "mild" with the likelihood of a right radiculopathy or proximal neuropathy noted to be "low" (Exhibit B41F).

It would appear that the claimant has not had any further follow-up with regard to treatment of his neck/back pain complaints and with regard to his knee problems, it does not appear that surgery has been rescheduled. While attending orthopedic specialists have noted obvious deformity and swelling of the affected right knee; range of motion is otherwise full and strength is not markedly decreased, remaining only mildly reduced at 4/5. Again, gait is non-antalgic and he is able to stand and walk unassisted. There is no evidence of muscle wasting or weakness and lower extremity movements are reportedly unrestricted and non-painful. There is no evidence of peripheral vascular insufficiency and the undersigned accepts that appropriate work-related precautions/restrictions have been afforded in this regard.

With regard to his documented heart disease, his condition is stable and

characterized as mild and non-obstructive. Aside from medical management and risk factor modification, no more aggressive forms of treatment and/or interventions have been indicated or undertaken, and it is noted that throughout his course of treatment, he has remained noncompliant with advised smoking cessation. Review of July 2009 admission records reflects that his chest pain was ruled as "noncardiac," and all cardiac testing at that time was within normal limits (Exhibit B3F). Only temporary work-related restrictions were imposed at this time, and subsequent follow-ups with Dr. Rashid, treating cardiologist, have revealed that his condition is stable without evidence of any significant coronary complications (Exhibits B13F and B43F). On October 2009 follow-up he was noted to be "doing well" with antiplatelet and calcium blocker therapies and denied any associated symptoms such as dyspnea, syncope, palpitations, edema, wheezing, or dizziness. EKG testing remained unchanged from earlier studies which had been interpreted as normal, and normal myocardial perfusion study was also noted with normal wall motion and left ventricular function. Most recently in September 2010, Dr. Rashid notes normal myocardial perfusion scan with normal treadmill testing showing normal hemodynamic response to exercise, good functional capacity, no chest pain, and nor[mal] arrhythmias - with medical clearance for surgery if so scheduled. His recent testimony indicates that his chest pain is minimal and medically managed, and for these reasons, the evidence provides no objective basis for further work-related restriction.

Aside from the assessments of the State agency medical consultants at Exhibits B9F and B17F, there have been no permanent work-related restrictions imposed upon the claimant during the relevant time period and the assessments of these non-examiners appear reasonable in light of the modest findings of record. As such, the undersigned has afforded great weight thereto. While the undersigned notes a prior 1994 ALJ decision; this decision and findings set forth therein are remote and it is further noted that the claimant has since engaged in work-related activity requiring medium to heavy exertion up until mid 2009.

With respect to the claimant's mental functioning, the evidence supports no more than moderate work-related limitations of function. Although the claimant alleges a longstanding history of anxiety, depression, and panic; he did not seek formal mental health treatment until several months after the alleged onset date, and prior to that presentation, consultative examination by Kelly Robinson, M.A., in October 2009 reflected no more than moderate deficiencies at best (Exhibit B8F). At this time, he was noted to be alert and fully oriented with thought processing logical and coherent. Thought content revealed no indication of delusions, obsession, or compulsions, and he denied any history of perceptual disturbances. Fair insight was exhibited, and judgment was reportedly intact. Although he demonstrated moderate deficiencies with respect to his recent memory functioning, immediate

memory was within normal limits and remote memory functioning only mildly deficient. Concentration was reported as normal and there was no evidence of psychomotor retardation or agitation. Social functioning and pace were similarly within normal limits and persistence was noted to be only mildly deficient. Although the claimant was assigned a "serious" GAF (Global Assessment of Functioning) rating of 45 on December 2009 intake at Prestera, findings on mental status evaluation do not appear totally supportive of such a degree of functioning, noting that the claimant was calm/cooperative; able to maintain good eye contact; demonstrated goal-oriented thought processing; exhibited no abnormalities of thought content; denied perceptual disturbances; and exhibited fair insight and judgment (Exhibit B11F). While medication doses were increased on May 2010 follow-up (Exhibit B21F), it was reported in July 2010 that he was feeling better (Exhibit B31F), and review of more recent records at Exhibits B36F and B42F reflects that there have been no major adjustments in his treatment/medication regimen suggesting any deterioration of condition. It is indicated that he retains fair-to-good recall and good insight and that it has been emphasized that he does have the ability to manage his emotions despite life's circumstances. He has admitted that therapy is beneficial with regard to symptom reduction and again, there is no indication that he has required any sort of crisis intervention and/or inpatient stabilization since the alleged onset date. Further review of the record reflects no evaluating or treating source opinions to address with regard to the claimant's mental work-related capabilities and the findings of record support that the assessments of the State agency psychological consultants are reasonable (Exhibits B15F and B16F). Accordingly, great weight has been afforded thereto.

While the undersigned has considered the claimant's substance abuse history, the evidence as a whole suggest that this condition is in remission and does not warrant a further reduction of the claimant's residual functional capacity.

(Tr. at 17-20.)

Social Security Ruling 96-7p clarifies when the evaluation of symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. The Ruling further directs that factors in

evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record.  This includes, but is not limited to:

- The medical signs and laboratory findings;

- Diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and

- Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

With respect to Claimant's argument that the ALJ wrongfully discredited Claimant's subjective complaints of pain, the court finds that the ALJ properly weighed Claimant's subjective complaints of pain in keeping with the applicable regulations, case law, and social security ruling ("SSR") and that his findings are supported by substantial evidence. 20 C.F.R. § 404.1529(b) (2006); SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

In his decision, the ALJ determined that Claimant had medically determinable impairments that could cause his alleged symptoms. (Tr. at 17.) The ALJ's decision contains a thorough consideration of Claimant's daily activities, the location, duration, frequency, and intensity of Claimant's pain and other symptoms, precipitating and aggravating factors, Claimant's medication and side effects, and treatment other than medication.  (Tr. at 17-20.) The ALJ explained his reasons for finding Claimant not entirely credible, including the

objective findings, the conservative nature of Claimant's treatment, the lack of evidence of

side effects which would impact Claimant's ability to work, and his broad range of self-

reported daily activities.  Id.

Remand for New Evidence

Claimant final argument is that the Appeals Council erred in failing to consider the

new and additional evidence and that a remand is necessary

It is important to note that the ALJ stated that "…[w]ith respect to the claimant's mental functioning, the evidence supports no more than moderate work-related limitations of function" (TR. 19).  Such a characterization is blatantly erroneous in light of the new and additional evidence tendered to the Appeals Council from the Plaintiff's treating physician, Nika Razavipour, M.D. (TR. 505-509).  This evidence reflects that the Plaintiff has a severe mental impairment, i.e. major depressive disorder, severe, with Marked and Extreme symptoms as follows: MARKED: Blunt, flat or inappropriate affect; feelings of guilt or worthlessness; Generalized persistent anxiety; Sleep Disturbance; EXTREME: Pervasive loss of interest in almost all activities; Decreased energy.

Obviously, this new and additional evidence provides sufficient basis for a fully favorable decision in this case.  At a minimum, the findings of Dr. Razavipour require a remand of this case for further consideration of the Plaintiff's mental impairments which the ALJ termed as "…no more than moderate" (TR. 19).  For some reason, the Appeals Council failed to make any mention of this new and additional evidence in its order, dated August 25, 2011 (TR. 1-6)…

Plaintiff requests that said SSI benefits and DIB be granted as provided by law, or, in lieu of such allowance, that this matter be remanded to the Defendant for rehearing in accordance with the rules and regulations of the SSA, and that Plaintiff be granted his costs herein expended.

(Pl.'s Br. at 7-8.)

The Commissioner responded that Claimant's remand request should fail for the

following reasons:

Plaintiff asserts that the Appeals Council erred in not addressing the additional evidence submitted after the ALJ's decision and should have

articulated with greater specificity its reasons for affirming the ALJ's decision (Pl. Br. at 7-8). Plaintiff is incorrect because the Fourth Circuit has explicitly held that the Appeals Council is not required to articulate any reason for denying a request for review. See Meyer v. Astrue, 662 F.3d 700, 704-07 (4th Cir. 2011); Hollar v. Comm'r of Soc. Sec., 194 F.3d 1304, 1304 (4th Cir. 1999), cert. denied, 530 U.S. 1219 (2000)(rejecting the argument that the Appeals Council must "articulate its own assessment of the additional evidence"). This Court has agreed that an in-depth explanation from the Appeals Council as to the weight afforded new evidence submitted by a claimant is not required. Bolin v. Astrue, No. 2:09-CV-00117, 2010 WL 1176570, at *17 (S.D.W.Va., March 23, 2010); Adkins v. Barnhart, 2003 WL 21105103, at *4 n. 3 (S.D.W.Va., May 5, 2003)...

Plaintiff's attempt to rely on this untimely produced evidence as a basis for substantial evidence remand or reversal also fails as a matter of law. The evidence produced by Plaintiff to the Appeals Council was never submitted to the ALJ. The Fourth Circuit has ruled that reviewing courts may consider evidence that was submitted for the first time to the Appeals Council so long as that evidence is "new" and "material." 20 C.F.R. §§ 404.970(b), 416.1470(b)...In this case, Plaintiff has failed to demonstrate that the evidence he submitted to the Appeals Council was "new" and "material," and the evidence may not be used to find that the ALJ's decision was not supported by substantial evidence.

First, Plaintiff has not even make an effort to meet his burden of showing that the appropriate standard of "newness" has been satisfied, because it is quite clear that most of this additional evidence, particularly Dr. Razavipour's July 2011 opinion, is not "new." Treatment notes at pages 525, 528-29, 539-40, and 551-52, spanning from October 2010 through March 2011, are all dated prior to the ALJ's decision and were obtainable prior to the ALJ's decision, if not prior to the administrative hearing in January 2011. Dr. Razavipour's records between April 2011 and July 2011 reflect that Plaintiff failed to show for multiple appointments - evidence which does not assist his claim that he suffered from disabling mental impairments during this time (Tr. 510-15). Dr. Razavipour's medical assessment of ability to do work-related activities, dated July 19, 2011, was available and obtainable prior to the hearing, because Plaintiff saw Dr. Razavipour multiple times, beginning with his initial assessment in December 2009, more than a year before the ALJ's decision (Tr. 322-27, 414, 429, 528, 525). Dr. Razavipour's opinion should have been procured prior to the administrative hearing, especially given that the ALJ held the record open for two weeks after the administrative hearing for Plaintiff to submit additional evidence (Tr. 56-57). [Footnote 8: Even assuming arguendo that Dr. Razavipour's opinion were new and material, it would be entitled to little weight because it is not well-supported by objective

medical evidence or consistent with the record as a whole, especially in light of her treatment plan, merely continuing Plaintiff's medications, and assessing GAF scores as high as 58 and 60 during treatment.] A party should not be permitted to vault the "newness" hurdle by simply submitting untimely evidence which purports to contradict the ALJ's findings...

Second, the Appeals Council considers new and material evidence <u>only</u> where it relates to the period <u>on or before the date of the ALJ's decision</u>. 20 C.F.R. §§ 404.970(b), 416.1470(b); Wilkins, 953 F.2d at 96. Indeed, there is no indication in Dr. Razavipour's opinion that it referred to Plaintiff's functional limitations prior to the ALJ's decision. A treating physician's retrospective opinion is only entitled to weight where it is corroborated by contemporaneous evidence...Accordingly, the opinion need not have been considered.

(Def.'s Br. at 16-18.)

Claimant has moved this court, pursuant to the sixth sentence of 42 U.S.C. § 405(g), to remand his claim to the administrative level for consideration of new evidence.

In <u>Wilkins v. Secretary</u>, 953 F.2d 93 (4th Cir. 1991), the Appeals Council incorporated into the administrative record a letter submitted with the request for review in which Wilkins' treating physician offered his opinion concerning the onset date of her depression. <u>Id.</u> at 96. The <u>Wilkins</u> court decided it was required to consider the physician's letter in determining whether substantial evidence supported the ALJ's findings. <u>Id.</u> The Fourth Circuit stated:

"Reviewing courts are restricted to the administrative record in performing their limited function of determining whether the Secretary's decision is supported by substantial evidence." *Huckabee v. Richardson*, 468 F.2d 1380, 1381 (4th Cir. 1972); *see* 42 U.S.C.A. § 405(g). The Appeals Council specifically incorporated Dr. Liu's letter of June 16, 1988 into the administrative record. Thus, we must review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the Secretary's findings.

<u>Id.</u> Under <u>Wilkins</u>, the court must review the record as a whole, including the new evidence submitted to the Appeals Council, in order to determine whether the ALJ's decision is

supported by substantial evidence.

The Appeals Council is not required to provide an in depth explanation for its decision that the additional evidence offered by Claimant does not warrant a change in the ALJ's decision. In an unpublished opinion, the United States Court of Appeals for the Fourth Circuit, noting Eighth Circuit precedent, rejected the notion that the Appeals Council must articulate its own assessment of additional evidence. Hollar v. Commissioner of Social Sec. Admin., 194 F.3d 1304, 1304 (4th Cir. 1999), cert. denied, 530 U.S. 1219, reh'g denied, 530 U.S. 1291 (2000) (citing Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992)); cf., Harmon v. Apfel, 103 F. Supp.2d 869, 872-73 (D. S.C. 2000) (court declined to follow Hollar and instead, required that the Appeals Council articulate its reasons for rejecting new, additional evidence). Instead, the court, relying on Browning and the fact that the regulations addressing additional evidence do not direct the Appeals Council to announce detailed reasons for finding that the evidence does not warrant a change in the ALJ's decision, determined that the Appeals Council's explanation was sufficient. 20 C.F.R. § 404.970(b) (2001). As in Hollar, the Appeals Council in this case did not err in failing to provide a more in depth explanation as to its decision.

The Appeals Council specifically incorporated the new evidence into the administrative record. As a result, the court must review the record as a whole, including the new evidence, in order to determine if the Commissioner's decision is supported by substantial evidence. Wilkins v. Secretary, 953 F.2d 93, 96 (4th Cir. 1991).

On July 28, 2011, Claimant's representative enclosed to the Appeals Council treatment records from Prestera Center for Mental Health Services, Inc. covering the period from July 7, 2010 through July 12, 2011 and a Mental Health Statement from Nika

38

Razavipour, M.D., Prestera Center, dated July 19, 2011.  (Tr. at 505-60.)

These records were previously described in the record section of this Memorandum Opinion and document ongoing treatment for Claimant's depression, anxiety, and polysubstance dependence, in full remission.

In considering Claimant's motion to remand, the court notes initially that the Social Security regulations allow two types of remand.  Under the fourth sentence of 42 U.S.C. § 405(g), the court has the general power to affirm, modify or reverse the decision of the Commissioner, with or without remanding the cause for rehearing for further development of the evidence.  42 U.S.C. § 405(g); Melkonyan v. Sullivan, 501 U.S. 89, 97 (1991).  Where there is new medical evidence, the court may remand under the sixth sentence of 42 U.S.C. § 405(g) based upon a finding that the new evidence is material and that good cause exists for the failure to previously offer the evidence.  42 U.S.C. § 405(g); Melkonyan, 501 U.S. at 97.  The Supreme Court has explicitly stated that these are the only kinds of remand permitted under the statute.  Melkonyan, 501 U.S. at 98.

In order to justify a remand to consider newly submitted medical evidence, the evidence must meet the requirements of 42 U.S.C. § 405(g) and Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985).[2]  In Borders, the Fourth Circuit held that newly discovered

---

[2] Within relevant case law, there is some disagreement as to whether 42 U.S.C. § 405(g) or the opinion in Borders provides the proper test in this circuit for remand of cases involving new evidence.  This court will apply the standard set forth in Borders in accordance with the reasoning previously expressed in this district:

> The court in Wilkins v. Secretary of Dep't of Health & Human Servs., 925 F.2d 769 (4th Cir. 1991), suggested that the more stringent four-part inquiry is superseded by the standard in 42 U.S.C. 405(g).  The standard in § 405(g) allows for remand where "there is new evidence which is material and . . . there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  However, Borders has not been expressly overruled.  Further, the Supreme Court of the

evidence may warrant a remand to the Commissioner if four prerequisites are met:  (1) the evidence is relevant to the determination of disability at the time the application was first filed and not simply cumulative; (2) the evidence is material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant has presented to the remanding court "at least a general showing of the nature" of the newly discovered evidence. Id.

Claimant discussed the additional evidence presented to the Appeals Council in the "Brief in Support of Judgment on the Pleadings", asserting that the "new and additional evidence" from Dr. Razavipour showed Claimant to have "a severe mental impairment" (Pl.'s Br. at 7-8.)

The Commissioner asserted that the additional evidence presented to the Appeals Council is not "new" because "Dr. Razavipour's medical assessment of ability to do work-related activities dated July 19, 2011…should have been procured prior to the ALJ hearing" and "the Appeals Council considers new and material evidence only where it related to the period on or before the date of the ALJ's decision…Indeed, there is no indication in Dr. Razavipour's opinion that it referred to Plaintiff's functional limitations prior to the ALJ's decision." (Def.'s Br. at 18-20.)    The Commissioner further argued: "Even assuming

---

United States has not suggested that Borders' construction of § 405(g) is incorrect.  Given the uncertainty as to the contours of the applicable test, the Court will apply the more stringent Borders inquiry.

Brock v. Secretary, Health and Human Servs., 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992) (citations omitted).

arguendo that Dr. Razavipour's opinion were new and material, it would be entitled to little weight because it is not well supported by objective medical evidence or consistent with the record as a whole, especially in light of her treatment plan, merely continuing Plaintiff's medications, and assessing GAF scores as high as 58 and 60 during treatment." (Def.'s Br. at 19.)

Contrary to Claimant's assertions, the ALJ decision already reflects a finding that Claimant has severe mental impairments. The ALJ found Claimant to have the severe mental impairments of "Major Depressive Disorder and Panic Disorder with history of substance abuse in remission." (Tr. at 13.) In a hypothetical to the VE, the ALJ included limitations related to these impairments:

> Now if we were to add the individual would be moderately limited in the ability to understand, remember and carry out detailed job instructions, moderately limited in the ability to interact appropriately with the general public, to accept instructions, respond appropriately to criticism from supervisors and to respond appropriately to changes in the work setting but retain the ability to learn for uncomplicated activities in a setting with limited interaction with other. With those limitations how would that effect jobs?

(Tr. at 55.)

The VE responded with several jobs that Claimant could perform with these mental impairment functional limitations. (Tr. at 55.)

Further, the July 19, 2011 assessment from Dr. Razavipour does not relate to the period on or before the date of the ALJ's decision dated April 1, 2011, as there is no indication in the assessment that it refers to Claimant's functional limitations prior to the ALJ's decision. (Tr. at 506-09.) Also, as pointed out by the Commissioner: "Treatment notes at pages 525, 528-29, 539-40, and 551-52, spanning from October 2010 through March 2011, are all dated prior to the ALJ's decision and were obtainable prior to the ALJ's

decision, if not prior to the administrative hearing in January 2011.  Dr. Razavipour's records between April 2011 and July 2011 reflect that Plaintiff failed to show for multiple appointments - evidence which does not assist his claim that he suffered from disabling mental impairments during this time (Tr. 510-15)."  (Def.'s Br. at 19.)

Of the "new" treatment notes submitted by Claimant, these show he continued to receive psychiatric treatment at Prestera Center from November 8, 2010 to July 12, 2011, in the form of medication management and rational emotive therapy.  (Tr. at 505-53.)   The records do not show a deterioration in Claimant's mental health, or additional diagnoses beyond those already found to be severe impairments by the ALJ and considered in the ALJ's RFC assessment.  Dr. Razavipour's Axis I diagnosis on the Mental Status Statement of July 19, 2011 is "MDD...Anxiety d/0 [disorder] NOS [not otherwise specified]/Polysubstance dependence in sustained full remission", essentially the same severe mental impairments found by the ALJ in his decision.  (Tr. at 13, 506.)

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence.  Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this court.

The Clerk of this court is directed to transmit copies of this Memorandum Opinion to all counsel of record.

ENTER: March 18, 2013

Mary E. Stanley
United States Magistrate Judge

42